**Tzvee ZAHAVY, Relator,**

v.

**UNIVERSITY OF MINNESOTA,
Respondent.**

No. C5–95–984.

Court of Appeals of Minnesota.

March 5, 1996.

Lawrence R. Altman, Mark A. Greenman, Altman & Kenas, Minneapolis, for Tzvee Zahavy.

Mark B. Rotenberg, General Counsel, University of Minnesota, Julie A. Sweitzer, Associate General Counsel, Minneapolis, for University of Minnesota.

Considered and decided by HUSPENI, P.J., and SCHUMACHER and FORSBERG*, JJ.

## OPINION

SCHUMACHER, Judge.

Relator Tzvee Zahavy was a tenured professor at the University of Minnesota. He seeks review of the Board of Regents' decision to terminate him. Zahavy claims the University's decision was arbitrary and unsupported by the evidence, resulted in a breach of his employment contract, and deprived him of a vested property right without due process of law. Zahavy also claims the termination procedures employed by the University were irregular and violated the open meeting law. We affirm.

## FACTS

Zahavy was a tenured professor in the University of Minnesota's College of Liberal Arts, Department of Classical and Near Eastern Studies. Zahavy was a well-known scholar in his field and a popular teacher.

In 1987, the College of William and Mary offered Zahavy a visiting professorship for the winter term of 1988. Zahavy notified his department chair of the offer. Shortly thereafter, Zahavy received a letter from an associate dean in the University's College of Liberal Arts, stating that Zahavy could not

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

remain on the University's payroll while receiving full pay from another institution because "[a] faculty member's compensation from this University assumes full-time availability for teaching, research and service." The associate dean suggested that Zahavy take a leave without pay from the University if he wished to accept the William and Mary offer.

The associate dean eventually agreed to give Zahavy permission to accept the William and Mary position while maintaining his position at the University, but refused to give Zahavy written permission. Zahavy subsequently filed a report of his outside duties at William and Mary. The report was approved in April 1988 by the University's President and Board of Regents.

Approximately four years later, in April 1992, Zahavy was offered a full-time tenured professorship at the University of North Carolina at Charlotte (UNCC), effective August 17, 1992. Zahavy presented UNCC's offer to his department chair and asked whether the University could match UNCC's offer or increase his current salary. Eventually, the University made Zahavy a retention offer, which Zahavy accepted.

Zahavy also accepted UNCC's offer, however. Zahavy testified that he decided to work at the University and UNCC concurrently, for no more than one year, until he could decide what to do. Admittedly, Zahavy did not request or receive permission from either the University or UNCC to hold concurrent tenured professorships.

Zahavy received $5,000 from UNCC for moving expenses, but he never moved to North Carolina. Instead, in late October 1992, Zahavy began commuting from Minnesota to North Carolina on Sundays, teaching classes at UNCC on Mondays and Wednesdays, holding office hours on Tuesdays, and returning to Minnesota on Wednesday evenings. He continued this schedule for approximately six weeks, without notifying either institution.

The Dean of the University's College of Liberal Arts, Julia Davis, eventually learned of Zahavy's concurrent positions and met with him twice to discuss the situation. During those meetings, Zahavy characterized his position at UNCC as a "consulting" position involving a very small number of hours. Zahavy also stated that he had only agreed to do 12 lectures for UNCC, that the compensation from UNCC was not for full-time work, and that he understood that the position at UNCC was for only one year. In fact, the position was tenured. Shortly after his initial meeting with Dean Davis, Zahavy resigned his position at UNCC. In May 1993, Zahavy filed a report describing his duties at UNCC as "teach one course & associated duties," and stating that he had only accrued six days of employment at UNCC.

In November 1993, Dean Davis presented her case against Zahavy to the tenured faculty of his department. Zahavy responded to Dean Davis's charges. Following the hearing, the faculty voted 18–0 in favor of pursuing termination proceedings against Zahavy.

Based on the faculty's vote, Dean Davis recommended to Provost Ettore Infante that Zahavy be dismissed. Provost Infante notified Zahavy that he had decided to proceed with Dean Davis' recommendation, and informed Zahavy of his right to a hearing before a panel of the University's Senate Judicial Committee. Zahavy subsequently filed a complaint against Dean Davis with the Senate Judicial Committee, claiming that the decision to initiate termination proceedings against him was contrary to the University's Tenure Regulations.

A six-member panel of the Senate Judicial Committee conducted a three-day hearing and considered evidence presented by attorneys for Zahavy and the University. Several witnesses testified. Following the hearing, the panel issued findings and a recommendation that Zahavy be dismissed. The panel based its recommendation on a finding that Zahavy's conduct had impaired his fitness in a professional capacity.

The University's President, Nils Hasselmo, reviewed the panel's findings and recommendation and considered oral and written arguments by the parties' attorneys. President Hasselmo accepted the panel's findings and recommendation that Zahavy's tenured professorship be terminated.

Zahavy appealed President Hasselmo's decision to the University's Board of Regents. At a special April 7, 1995 meeting, the Regents heard oral arguments by the parties' attorneys, questioned the attorneys, and heard statements offered by students on behalf of Zahavy. The Regents reviewed President Hasselmo's actions, the panel's findings and recommendations, and the claims made on behalf of Zahavy. The Regents approved the President's decision and dismissed Zahavy as a member of the University's tenured faculty.

## ISSUES

1. Did the University err by concluding that Zahavy's actions severely impaired his fitness in a professional capacity?

2. Did the University's Senate Judicial Committee panel apply an incorrect burden of proof?

3. Did the panel err by considering issues that had not been addressed previously by Dean Davis or Provost Infante?

4. Did the panel err by denying Zahavy's requests for discovery and by refusing to allow his witnesses to testify?

5. Did President Hasselmo and the Board of Regents err by failing to determine whether two panel members had a conflict of interest?

6. Are the panel's findings unsupported by the evidence?

7. Did the Board of Regents violate the open meeting law?

8. Is Zahavy's breach of contract claim reviewable on this certiorari appeal?

## ANALYSIS

■■■ Review by certiorari is limited to an inspection of the record of the administrative tribunal, and this court is confined to questions affecting the regularity of the proceedings and, as to the merits of the controversy, whether the determination was arbitrary, oppressive, unreasonable, fraudulent,

made under an erroneous theory of law, or without any evidence to support it. * * * A reviewing court may reverse a university's decision * * * only if it finds a lack of substantial evidence to support that ruling. * * * Academic judgments are afforded great discretion, since decisions regarding a person's scholarship require expert evaluations that are not readily adapted to the procedural tools of judicial decision-making. *Chronopoulos v. University of Minn.*, 520 N.W.2d 437, 441 (Minn.App.1994) (citing *Board of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90, 98 S.Ct. 948, 955, 55 L.Ed.2d 124 (1978); *Ganguli v. University of Minn.*, 512 N.W.2d 918, 921 (Minn.App.1994); *Harford v. University of Minnesota*, 494 N.W.2d 903, 909 (Minn.App.1993), *review denied* (Minn. Mar. 30, 1993)), *review denied* (Minn. Oct. 27, 1994).

■■■ 1. The Board of Regents determined that Zahavy's conduct violated section 10.2(b) of the University's Tenure Regulations, which provides as follows:

A faculty appointment may be terminated or suspended before its ordinary expiration only for one or more of the following causes:

* * *

(b) Unprofessional conduct which severely impairs a faculty member's fitness in a professional capacity.

For purposes of this appeal, Zahavy does not dispute the Regents' determination that his conduct was unprofessional. Zahavy argues, however, that the Regents erred by failing to enunciate specifically how his conduct severely impaired his fitness in a professional capacity.[1] Zahavy also argues that this error violated his substantive due process rights. *See Ross v. University of Minn.*, 439 N.W.2d 28, 34 (Minn.App.1989) (stating that to prove violation of substantive due process, University professor must "demonstrate that the University acted arbitrarily in dismissing him or that the dismissal

---

1. Zahavy argues incorrectly that by failing to respond in its brief to this argument, the University has conceded the point. *See McDonough v. City of Rosemount*, 503 N.W.2d 493, 497 (Minn.

App.1993) ("if a respondent fails to address an issue, it will be decided on the merits"), *review denied* (Minn. Sept. 10, 1993).

was 'such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment' ") (quoting *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985)), *review denied* (Minn. July 12, 1989).

The Board of Regents approved the following findings by the Senate Judicial Committee panel:

> Professor Zahavy's "fitness in a professional capacity" has been impaired by his conduct so as to justify his termination. A faculty member who is protected by tenure has the obligation to conduct himself in a trustworthy manner with the University. Failure to maintain a relationship of trust with the administration or faculty colleagues constitutes unprofessional conduct. To hold two positions without telling either employer and to try to hide the fact that one holds two such position[s] is misrepresentation. It undermines a basic, necessary trust.

We conclude that the above findings are sufficient to support the Board of Regents' decision to dismiss Zahavy.

The Tenure Regulations themselves do not specify how a faculty member's conduct may severely impair his or her fitness in a professional capacity. Zahavy argues that impairment of his fitness in a professional capacity requires impairment of his teaching, scholarship, and service. Zahavy believes that "fitness in a professional capacity" should be equated with "professional activities," which the Board of Regents' Policy on Consulting and Outside Affiliations defines as including teaching, scholarship, and service.

In *Mueller v. Regents of Univ. of Minn.,* 855 F.2d 555 (8th Cir.1988), the court stated that "[t]he Tenure Code, not the Regents' Policy on Outside Consulting, sets forth the standards and procedures for termination of [a tenured professor's] contract." *Id.* at 560. The *Mueller* court refused to second-guess the University's decision to terminate a professor's tenure, even though neither party had offered direct evidence on the professor's teaching ability. *Id.* at 559–60. The *Mueller* decision contravenes Zahavy's claim that the University must prove that his teaching, scholarship, and service were impaired by his unprofessional conduct.

■ We conclude that a tenured professor's "fitness in a professional capacity" need not necessarily be tied to the professor's teaching, scholarship, and service. A teacher's fitness to teach and his influence on his pupils does not depend solely on the teacher's actions within the boundaries of the classroom. *Meinhold v. Clark County Sch. Dist.,* 89 Nev. 56, 506 P.2d 420, 425–26 (1973), *cert. denied* 414 U.S. 943, 94 S.Ct. 247, 38 L.Ed.2d 167 (1973). In other professions, as well, the courts have suggested that "professional fitness" may include conduct that is not directly related to the performance of one's professional duties. *See, e.g., In re Kennedy,* 542 A.2d 1225, 1227–28 (D.C.1988) (concluding that attorney's dishonesty, fraud, deceit or misrepresentations regarding his personal affairs justified temporary suspension, noting that some conduct in private capacity may reflect adversely on professional fitness); *Yetta's Rest., Inc. v. State Liquor Auth.,* 47 Misc.2d 436, 262 N.Y.S.2d 743, 746 (N.Y.Sup.1965) (stating that "fit person" to receive liquor license does not include applicant who makes deliberate misrepresentations or knowingly conceals facts to obtain license); *Brody v. Barasch,* 155 Vt. 103, 582 A.2d 132, 134 (1990) (finding sufficient connection between applicant's misrepresentations on his resume and his professional fitness to justify denial of psychologist-doctorate license).

Zahavy concealed his dual employment from UNCC and the University, knowing the University would not have permitted his dual employment. Zahavy was absent for three full working days each week from the University, while at the same time receiving a salary from the University. This period of time away from the University clearly prevented him from applying himself full time to his scholarship and service at the University, which he knew he was required to do. This was a misuse of the University's resources and time that interfered with Zahavy's usefulness to the University. *See Mueller,* 855 F.2d at 560 (concluding that professor's mis-

use of University's resources and time "would seriously interfere with his usefulness to the University"). We conclude, therefore, that Zahavy's conduct was unprofessional and severely impaired his fitness in a professional capacity in violation of Section 10.2(b) of the University's Tenure Regulations.

In addition, in several instances the courts have suggested that a professional's fitness should be determined by those practicing in the area. Thus,

> what constitutes "unprofessional conduct" and what renders a professional "unfit" or "incompetent" are to be determined "by those standards which are commonly accepted by those practicing in the same profession in the same territory" * * * These standards are part of the ethics of the profession, and every member of the profession should be regarded as an expert with regard to the determination of their meaning.

*Altholtz v. Connecticut Dental Comm'n,* 4 Conn.App. 307, 493 A.2d 917, 922 (1985) (quoting *Leib v. Board of Examiners for Nursing,* 177 Conn. 78, 411 A.2d 42, 48 (1979)). Here, all 18 members of Zahavy's department, six members of the Senate Judicial Committee panel, the President of the University, and the Board of Regents unanimously and unqualifiedly determined that Zahavy's actions rendered him unfit to continue as a tenured professor. We choose not to second-guess their decision, particularly in light of the narrow standards of review to which we are bound.

▬ 2. The University's Tenure Regulations required Dean Davis to prove her case for terminating Zahavy by "clear and convincing evidence."[2] Zahavy claims that the Senate Judicial Committee panel erred by imposing a lower standard of proof on Dean Davis, allowing her to support her case for terminating Zahavy by a preponderance of the evidence.[3]

We recognize that the Senate Judicial Committee panel in its prehearing order incorrectly stated that Dean Davis had the burden of supporting her claim for termination by a preponderance of the evidence. It is unclear, however, whether the panel actually applied that incorrect standard of proof; in its findings and decision, the panel merely stated: "Respondent had the burden of establishing proof, consistent with *Regulations Concerning Faculty Tenure,* [Section] 14.3."

Whether or not the wrong standard of proof was applied, however, the facts in this case are undisputed, and there were no credibility issues to be resolved by the fact finders. The undisputed facts indicate that Zahavy held two full-time tenured positions concurrently, with an intent to deceive both institutions. Zahavy had been informed previously that a faculty member's service to the University assumed full-time availability for teaching, research, and service. We conclude, as a matter of law, that Dean Davis proved her case for termination by clear and convincing evidence. *See Kornberg v. Kornberg,* 542 N.W.2d 379, 387 n. 3 (Minn.1996) (concluding that application of wrong standard of proof was subject to harmless error standard of review).

3. Provost Infante did not state in his decision whether Zahavy actually misrepresented to the University his employment status at UNCC. The Senate Judicial Committee panel found that Zahavy had misrepresented his employment circumstances, that Zahavy's acceptance of the University's retention offer constituted a representation that he had turned down UNCC's full-time

---

2. The Tenure Regulations also require the University to demonstrate "the appropriateness of the proposed action, rather than some lesser measure." Although Zahavy mentions this issue in passing, in a footnote to his brief, he has not actually addressed the issue; therefore, we deem the issue waived. *See Schoepke v. Alexander Smith & Sons Carpet Co.,* 290 Minn. 518, 519–20, 187 N.W.2d 133, 135 (1971) ("assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection").

3. We note that Zahavy did not raise the burden of proof issue in his arguments to the Senate Judicial Committee panel or on appeal to President Hasselmo or the Board of Regents. Ordinarily, when a party fails to raise an issue below, he is precluded from raising the issue for the first time on appeal. *Ganguli,* 512 N.W.2d at 923.

tenure offer, and that, when caught, Zahavy misrepresented his status at UNCC in meetings with Dean Davis and in a written report of outside professional activities. The panel also noted that Zahavy had requested reimbursement from both the University and UNCC for travel and other expenses associated with the same seminar. The Board of Regents adopted the panel's findings in their entirety.

■ Zahavy argues that the panel erred by considering issues that were not previously considered by Provost Infante.[4] Zahavy also claims that this error violated his substantive due process rights. In response, the University claims that a Senate Judicial Committee panel does not conduct an appellate review of the Provost's decision, but conducts its own evidentiary hearing and makes findings of fact, which are reviewed on appeal by the President and ultimately the Board of Regents.

The University's position is supported by a more logical reading of the University's Tenure Regulations. While it is undisputed that Zahavy "appealed" Provost Infante's decision to the Senate Judicial Committee, the University's Tenure Regulations indicate that the Senate Judicial Committee panel properly conducted an initial evidentiary hearing. For example, the Regulations at section 13 refer to the "hearing" procedures of the Senate Judicial Committee, as compared to "appeals" to the Board of Regents. The Regulations at section 15 distinguish "hearings" by the Senate Judicial Committee in matters of this nature and "appeals" to the Senate Judicial Committee of other matters. In addition, the Senate Judicial Committee's Statement of Procedural Principles and Rules of Procedure address the Senate Judicial Committee's direct consideration of termination issues, as compared to its "appellate jurisdiction" over other matters.

■ 4. The Senate Judicial Committee's procedural rules provide for discovery of all relevant documents that are not privileged. Zahavy's attorney sought to discover the names of "other faculty members who have held tenured positions at other Universities concurrent with their tenured positions at the University of Minnesota." Zahavy claimed that the information sought would have proved that other University professors held concurrent tenured positions at other institutions.

The attorney for the University replied that a search of the University's computer files had produced no reports of outside activities using the word "tenure" or "tenured," or identifying other "full-time" or "100%" positions. The University's attorney claimed that further compliance with Zahavy's discovery request would require a manual investigation of the individual personnel files of approximately 3,100 faculty members, which would be very time-consuming and burdensome.

The chair of the Senate Judicial Committee panel denied Zahavy's discovery request, reasoning that further investigation by the University would be too burdensome and that the terms of other faculty members' employment were not relevant to the issue of whether Zahavy's conduct impaired his fitness in a professional capacity.

■ In civil trials, the district court has considerable discretion when granting or denying discovery requests, and absent a clear abuse of discretion, the district court's decision will not be reversed on appeal. *Erickson v. MacArthur,* 414 N.W.2d 406, 407 (Minn.1987). Similarly, we conclude that the abuse of discretion standard of review is appropriate when reviewing the University's discovery decisions. *Cf. Chronopoulos,* 520 N.W.2d at 441 (ultimate decision to dismiss University professor is accorded great discretion by courts).

---

**4.** We note that, in its prehearing order, the Senate Judicial Committee panel listed the issues to be determined as including the allegation that Zahavy misrepresented his employment circumstances. Zahavy failed to object at that time to the panel's characterization of the issues. Nor did Zahavy object to the panel's consideration of the misrepresentation issue in his arguments to President Hasselmo or on appeal to the Board of Regents. When a party fails to raise an issue below, he is ordinarily precluded from raising the issue for the first time on appeal. *Ganguli,* 512 N.W.2d at 923.

A district court may limit discovery upon a determination that it would be

> unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation.

Minn.R.Civ.P. 26.02(a)(3). Similarly, here, the chair of the Senate Judicial Committee panel balanced the concerns of the parties and concluded that Zahavy's requested discovery would be unduly burdensome. The panel's decision was based upon the evidence submitted by the University and was not an abuse of discretion.

At the prehearing conference, Zahavy indicated that he intended to call 61 students who had been enrolled in his classes at the University during the fall quarter of 1992, when Zahavy was also teaching at UNCC. Zahavy's stated purpose in calling the 61 students was to prove that his fitness in a professional capacity had not been impaired by his concurrent employment at the University and UNCC. The Senate Judicial Committee panel denied Zahavy's request to call the 61 witnesses because the attorney for the University stipulated that she was not claiming that the quality of Zahavy's teaching had been inadequate or that he had failed to keep his posted office hours.[5]

In light of our conclusion that the term "fitness in a professional capacity" is not necessarily tied to a professor's teaching ability, we conclude that the Senate Judicial Committee panel did not err by denying Zahavy's request to call the 61 students to testify regarding his teaching ability.

■ 5. Zahavy argues that the chair of the Senate Judicial Committee panel, Professor Shirley Garner, had a conflict of interest that was never disclosed to him and was unknown by him at the time of the hearing. Zahavy claims that in the middle of the hearing process, Dean Davis approved the appointment of Professor Garner as chair of her department. Zahavy also claims that both Professor Garner and Professor David Ward, the chair of the Senate Judicial Committee itself, were department chairs behol-

den to Dean Davis on a number of matters, including their departments' budgets.

While these circumstances may have demonstrated improper conflicts of interest by Professors Garner and Ward, Zahavy has not proven to our satisfaction that the alleged conflicts warrant reversal. Again, the material facts were undisputed, and three levels of decision-makers found that Zahavy's conduct was sufficiently severe to warrant his discharge. Zahavy has not satisfied us that the circumstances of this case warrant reversal. *See Hunt v. Regents of Univ. of Minn.*, 460 N.W.2d 28, 33 (Minn.1990) (stating general rule that error without prejudice does not require reversal).

■ 6. Zahavy argues that Provost Infante's decision to terminate him was arbitrary and unsupported by the evidence. Provost Infante's decision, however, was merely the impetus for a full hearing by the Senate Judicial Committee panel, whose decision was reviewed by President Hasselmo and then the Board of Regents. Zahavy has appealed from the Board of Regents' decision, and it is the Regents' decision that is reviewed by this court. Although alleged procedural irregularities leading to the Regents' decision are reviewable, the substantive decision of Provost Infante is not reviewable by this court on a writ of certiorari. *See Tuff v. Knitcraft Corp.*, 526 N.W.2d 50, 51 (Minn.1995) (appellate court should review Commissioner's decision, rather than referee's because, on appeal, Commissioner could make new findings and decision); *Warwick v. Warwick*, 438 N.W.2d 673, 676 (Minn.App. 1989) (when trial court may receive new evidence after reviewing referee's report, court of appeals reviews trial court's decision).

■ Zahavy also argues that three of the Senate Judicial Committee panel's findings, accepted by President Hasselmo and the Board of Regents, are unsupported by the record. The Senate Judicial Committee panel found:

> Neither party nor any witness knew of others at the University of Minnesota holding two tenure-track positions.

---

5. Zahavy was allowed to present testimony by his

teaching assistant during the fall quarter of 1992.

The evidence on this issue was conflicting, but Provost Infante testified that he never approved any University professor's request to hold two full-time tenured positions at two institutions concurrently. Furthermore, Dean Davis testified that she had investigated the situations of all professors who Zahavy claimed held concurrent full-time, tenured positions at two institutions, and she did not find anyone whose situation was similar to Zahavy's.

The Senate Judicial Committee panel found:

> Professor Zahavy knew that accepting two full-time, tenured positions was unacceptable because of his earlier efforts to win agreement from the College of Liberal Arts to allow him to accept a distinguished chair's position at William and Mary while he was teaching full-time at the University of Minnesota.

This finding is amply supported by the evidence. Zahavy received a letter in October 1987 from an associate dean in the College of Liberal Arts stating:

> A faculty member's compensation from this University assumes full-time availability for teaching, research and service. Thus a leave without pay would be the best route to accepting the William and Mary offer.

At that time, Zahavy knew that he had to receive written permission to accept the position at William and Mary, which was only a one-time, three-month, two-course teaching appointment, rather than the full-time, permanent, tenured appointment Zahavy later accepted at UNCC. This evidence, and the record as a whole, supports the panel's finding that Zahavy knew, based on his prior experience, that it would be wrong to accept the UNCC position after accepting the University's retention offer.

The panel found:

Evidence that Professor Zahavy actively and intentionally misrepresented his employment circumstances is further provided through his requests for travel reimbursements for a professional meeting in San Francisco, in November 1992, from both the University of Minnesota and the University of North Carolina—Charlotte. Professor Zahavy presented requests for reimbursements of identical expenses for lodging, meals, and meeting registration to both the University of Minnesota * * * and the University of North Carolina—Charlotte * * *. Intentional misrepresentation is further evidenced in these documents by the fact that whereas his Minnesota home address is present on the hotel bill presented to the University of Minnesota * * *, this address is blacked out on the copy of the bill presented to the UNC—Charlotte.

Zahavy argues that his undisputed testimony showed that there was no overlap of the expenses submitted to the two institutions. The exhibits submitted by the University, however, indicate that the University and UNCC both reimbursed Zahavy for some of the same expenses incurred during the conference in San Francisco, including a $60 registration fee, for which Zahavy billed both the University and UNCC $60, and meals, for which Zahavy received a $34 per day from the University and $26 per day from UNCC.

▮▮▮▮ 7. When the Board of Regents met to consider Zahavy's appeal, it divided the meeting into two sessions. The first session, consisting of presentations by the parties' attorneys and questioning by the Regents, was open to the public. Following a brief recess, the Board of Regents convened in a closed session to conduct its deliberations. Zahavy argues that the Board of Regents improperly closed the second session of its meeting, in violation of the open meeting law.[6]

---

6. Zahavy also argues that he was "forced at the prehearing conference to resort to making a motion before the Senate Judicial Committee to hold his hearing in public." But a panel of the Senate Judicial Committee is not a "governing body" or "committee, subcommittee, board, department or commission thereof," subject to the open meeting law. *See* Minn.Stat. § 471.705,

subd. 1 (1994). In *Minnesota Daily v. University of Minn.*, 432 N.W.2d 189 (Minn.App.1988), *review denied* (Minn. Jan. 25, 1989), the court determined that resolution of this issue turned on whether a meeting was "in effect, the deliberations of the regents." *Id.* at 192. In *Sovereign v. Dunn*, 498 N.W.2d 62 (Minn.App.1993), *review denied* (Minn. May 28, 1993), the court held:

The University does not dispute that it is a public body whose Board of Regents is subject to the open meeting law, Minn.Stat. § 471.705, subd. 1 (1994). The University argues, however, that the Regents' proceedings in this matter were excepted from the open meeting law because the Regents operated in a quasi-judicial fashion when determining the discipline to be imposed upon Zahavy. The University cites language in the open meeting law stating that its provisions "shall not apply to any state agency, board, or commission when exercising quasi-judicial functions involving disciplinary proceedings." *Id.* We agree that this exception to the open meeting law is applicable here, because the Board of Regents was acting in a quasi-judicial capacity when considering whether to discipline Zahavy for his actions.

We also note that Zahavy did not object to the closed session, despite receiving explicit notice in writing that the second part of the meeting would be closed. *See Ganguli*, 512 N.W.2d at 923 (failure to raise issue below ordinarily precludes consideration of the issue on appeal).

8. Zahavy argues that the University breached certain contract provisions contained in its Tenure Regulations. But a breach of contract action should be initiated in district court. *See Mueller*, 855 F.2d at 560 (considering appeal from breach of contract action instituted in district court); *Harford*, 494 N.W.2d at 906 (concluding that regents lacked jurisdiction to decide breach of contract claims); *Johnson v. Independent Sch. Dist. No. 281*, 494 N.W.2d 270, 275 (Minn.1992) (noting that teacher's claim of breach of contract was not before court on review by certiorari). Therefore, we decline to consider Zahavy's breach of contract claim in this certiorari appeal.

### DECISION

The Board of Regents' decision and decision-making process were in accordance with the University's Tenure Regulations and the applicable law.

**Affirmed.**

[A] gathering of public officials is not a "committee, subcommittee, board, department or commission" subject to the open meeting law unless the group is capable of exercising decision-making powers of the governing body.

*Id.* at 67. Here, the Senate Judicial Committee panel issued recommendations, not decisions; thus, as the University argues, its proceedings were not subject to the open meeting law.